**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JEFFREY DAVIS, ) | |
| JESSIE RANDOLPH, ) | |
| DONALD WASHINGTON, and ) | |
| RANDALL NOBLE, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 10 C 3216 |
| ) | |
| METROPLEX, INC., ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are four African-American men formerly employed as security guards at the Marshall Field Garden Apartment Homes ("MFGAH"), a subsidized housing project. Plaintiffs are suing Defendant Metroplex, Inc., the property manager for MFGAH, alleging that two of its supervisory employees discriminated against Plaintiffs because of their race. Specifically, Plaintiffs assert that Defendant: (1) created a hostile work environment in violation of Title VII (Count I); engaged in race-based discrimination in violation of 42 U.S.C. § 1981 (Count II); and wrongfully terminated them because of their race in violation of Title VII (Count III). Defendant has moved for partial summary judgment on Count III only, challenging Plaintiffs' allegations that race discrimination motivated their terminations and alleging that it had legitimate, non-discriminatory reasons for discharging all four Plaintiffs.[1] For the reasons explained herein, the court grants the motion with respect to Plaintiffs Noble, Randolph, and Washington, but denies the motion with respect to Plaintiff Davis.

**FACTUAL BACKGROUND**

---

[1] Defendant also states that, to the extent Plaintiffs' § 1981 claim for race discrimination relies on allegations of wrongful termination, its motion for partial summary judgment "is directed to those claims as well." (Def.'s Mot. for Partial Summ. J., at 1 n.1.) If Defendant seeks to preclude Plaintiffs from arguing wrongful termination as part of its § 1981 claim at trial, the court will address the propriety of such arguments, and corresponding evidence, at that time.

Until their terminations in 2008 and 2009, Plaintiffs Jeffrey Davis, Randall Noble, Jessie Randolph, and Donald Washington worked as security guards at MFGAH, a ten-building complex occupying two square city blocks. (Def.'s 56.1 ¶¶ 1, 5.) Plaintiffs first worked under the direct supervision of Director of Security Robert Thorne and then under his replacement, Diana Woznicki. (Def.'s 56.1 ¶¶ 11, 12.) Defendant hired Woznicki, a white woman, on or about April 9, 2008, shortly after Thorne, a black man, retired. (Def.'s 56.1 ¶ 12, 14.) Woznicki's immediate supervisor was Darlene Sand, the property manager for MFGAH and also a white female. (Def.'s 56.1 ¶¶ 11, 12.) Sand, in turn, answered to Management Supervisor Trudy Nelson, who oversaw operations at MFGAH, as well as several other properties, and participated in staffing decisions for those properties. (Def.'s 56.1 ¶¶ 7, 24.) John Kennedy, the Director of Human Resources and Vice-President of Operations and General Counsel, was responsible for establishing employment policies and for making company-wide staffing decisions related to hiring and firing. (Def.'s 56.1 ¶¶ 2, 8, 24.) Nelson and Kennedy, too, are white. (Pl.'s Add'l Facts ¶ 2.)

The security staff at MFGAH is comprised of roughly sixty part-time employees, the overwhelming majority of whom are African-American. (Def.'s 56.1 ¶¶ 9, 10.) Indeed, to the extent that Plaintiffs were replaced after their terminations, the new hires were all African-American.[2] (Def.'s 56.1 ¶ 79.) All employees receive copies of Metroplex's anti-discrimination and anti-harassment policies which "obligate employees to immediately report perceived harassment or discrimination to [Kennedy]." (Def.'s 56.1 ¶ 22.)

**I.    Plaintiff Jeffrey Davis**

Davis worked as a security guard at MFGAH from 1999 until his termination in October 2008. For the last two years of his employment, he held the title of Assistant Director of

---

[2] When Metroplex discharged Davis, it eliminated his position and reassigned some of his duties to a new position called the Security Operations Manager (Def.'s 56.1 ¶ 80); the only person to have held that position, Eric Cato, is also black. (Def.'s 56.1 ¶ 80.)

Security. (Davis Decl., Ex. A to Pl.'s App. of Materials in Supp. of its Resp. to Def.'s Mot. for Partial Summ. J., ¶¶ 2, 3; Def.'s 56.1 ¶ 13.) Prior to Woznicki's hiring as Director of Security on April 9, 2008 (Def.'s 56.1 ¶ 12), Davis had received only one disciplinary report during his nine-year tenure at MFGAH. (Davis Decl. ¶ 11.) In the six months between Woznicki's hiring and Davis's termination, he was written up three times. (Davis Decl. ¶ 12.)

His increasingly frequent incident reports were not the only indicator that Davis's relations had soured with management: he, and his co-Plaintiffs, allege that Sand and Woznicki routinely used racial slurs around the workplace. (*See, e.g.*, Davis Decl. ¶¶ 6, 10.) Specifically, Davis alleges that he heard Sand refer to black tenants as "nigger" and "black bitches." (Davis Decl. ¶ 6.) He also heard Sand call him a "black bastard." (Davis Decl. ¶ 6.) Davis alleges, further, that Woznicki, like Sand, used "racially inflammatory language" with respect to blacks, and that she had referred to black female tenants as "black bitches." (Davis Decl. ¶ 10.) Moreover, co-Plaintiff Jessie Randolph states that he once overheard an exchange between Sand and Woznicki about Davis in which one of the women (he does not say which one) said she was "'gonna fire his black ass and teach him a lesson.'" (Randolph Decl., Ex. C to Pl.'s App., ¶ 4.)

While Davis alleges his termination resulted from Sand's and Woznicki's racial animus, Defendant maintains that it terminated Davis' employment because of his violation of an important Metroplex policy that requires officers to deny individuals entry to MFGAH if they do not enter a security code or if they are on the "barred" visitors list. (Def.'s Mem. of Law in Supp. of Mot. for Partial Summ. J., at 5-6.) On April 7, 2008, Sand circulated a memo to MFGAH security staff reminding them of this policy. (Def.'s 56.1 ¶ 28.) The memo also emphasized that an employee caught violating the policy "could be terminated immediately." (Def.'s 56.1 ¶ 28.) Nevertheless, on October 2, 2008, Davis instructed two lower-ranking security officers to grant access to a visitor despite the visitor's status on the "barred" list. (Def.'s 56.1 ¶ 30.) Davis does not deny that he granted access to a "barred" visitor (Davis Dep., Ex. E to Def.'s App. of Materials in Supp. of its Mot.

3

for Partial Summ. J., 9:7-8), but he explained that he granted the exception in return for "pertinent information" from the visitor that he insists helped prevent a violent crime later that same evening. (Davis Dep. 10:3-21.) Davis maintains that because he "was responsible for the day-to-day operations of the security department," he had the authority to make exceptions to Metroplex policy. (Davis Dep. 13:15-23.)

Metroplex management disagreed. After viewing security tape footage that confirmed the incident's occurrence, Woznicki reported it to Sand, Nelson, and Kennedy. (Def.'s 56.1 ¶ 34.) There is some inconsistency concerning who is responsible for the subsequent decision to terminate Davis. In pleadings before this court, Defendant states that Nelson made the preliminary decision, but that Kennedy made the ultimate decision to terminate Davis after reviewing the management reports and the written statements made by the lower-ranking guards working with Davis that night. (Def.'s 56.1 ¶¶ 40, 41.) But in Metroplex's response to Davis's EEOC charge, Kennedy wrote that "Woznicki, Sand, and Nelson made the decision to terminate [Davis's] employment" and listed both Sand and Woznicki as parties "involved in the decision or recommendation to discharge [Davis]."[3] (Jan. 22, 2009 Letter Re: Jeffrey Davis v. Metroplex, Inc., EEOC Charge No. 440-2009-01512, Ex. H to Pl.'s App., at 6, 7.) Additionally, Metroplex maintains that, although it would have discharged Davis based on the "barred" guest incident alone, Kennedy also considered a second incident where Davis authorized another security officer to work twelve additional hours.[4] (Def.'s 56.1 ¶¶ 35-38, 42.) Subsequently, on October 20, 2008, Sand informed

---

[3] Metroplex objects to Plaintiffs' reliance on excerpts from its submissions to the EEOC because the letters "have not been properly authenticated, certified, or otherwise made usable at trial." (Def.'s Reply Mem. at 2-3.) Metroplex does not otherwise explain why the court should be suspicious of documents authored by its own agents. The court has no reason to believe the excerpts are misleading or inauthentic, and therefore overrules the objection and considers the documents for summary judgment purposes.

[4] Davis admits that he authorized the officer to work an additional twelve hours but maintains that he did so only after obtaining Woznicki's prior authorization. (Davis Dep. 41:8-42:9.)
(continued...)

Davis of his termination. (Def.'s 56.1 ¶ 43.)

## II. Plaintiff Randall Noble

Plaintiff Randall Noble had worked as a security officer at MFGAH for almost ten years before his August 2008 termination. (Noble Decl., Ex. B to Pl.'s App., ¶ 2.) Like Davis, Noble reports hearing both Sand and Woznicki use racially inflammatory language. (Noble Decl. ¶¶ 6, 9.) Noble also heard Sand refer to black people as "niggers," and alleges that she once said to him, "'[Y]our black ass is too friendly with these fucking niggers, you must not want your job.'" (Noble Decl. ¶ 6.) When Metroplex ultimately terminated Noble's employment, he refused to sign his termination agreement; he claims that Sand responded by calling him a "fucking nigger" and Woznicki told him to "get [his] black ass out of [there]." (Noble Decl. ¶¶ 6(c), 9.) He too asserts that race discrimination by Sand and Woznicki led to his discharge.

Metroplex, however, states that it fired Noble because he allowed a young man to enter an apartment where he was not a resident and had no permission to enter; the female tenant who lived in the unit was "very upset" when she came home to find an intruder in her home without her consent. (Def.'s 56.1 ¶¶ 46-47.) The female tenant lodged a complaint with Woznicki, who investigated the matter by speaking with Raymond Trunzo, the supervisory officer on duty the night of the incident. (Def.'s 56.1 ¶¶ 46, 48.) Trunzo told Woznicki that, despite Trunzo's warning that the tenant had to authorize the young man's entry, Noble had insisted that he knew the tenant, that she would consent to the young man's entry, and that he would "take the heat" if the tenant was upset. (Def.'s 56.1 ¶ 49.) Noble believed the young man to be the tenant's son and thus, his entry acceptable, but Noble was mistaken; the young man was not the tenant's son and he did not reside in the unit to which Noble granted him access. (Def.'s 56.1 ¶¶ 51, 52.)

---

[4](...continued)
Woznicki, however, denies ever authorizing the overtime and states that she did not even know about the incident until the officer involved complained to her that he was not compensated for the additional hours. (Woznicki Decl., Ex. D to Def.'s App., ¶ 4(b).)

Noble did "take the heat" for the incident. Woznicki and Sand brought the matter to the attention of Nelson, who then made a preliminary determination to discharge Noble. (Def.'s 56.1 ¶ 53.) When Nelson sought input from Kennedy about her decision, he suggested that she corroborate Woznicki's version of events (Def.'s 56.1 ¶ 54), so Nelson obtained a written statement from the tenant stating that Noble had permitted an unauthorized guest to enter her apartment. (Def's 56.1 ¶ 55.) Thereafter, Kennedy decided to terminate Noble, and Sand met with Noble to inform him of his termination on August 6, 2008. (Def.'s 56.1 ¶¶ 56, 57.) As noted, Noble claims that in the meeting, Sand called him a "fucking nigger" and Woznicki told him to "get [his] black ass out of [there]." (Noble Decl. ¶¶ 6(c), 9.)

### III.  Plaintiff Jessie Randolph

Metroplex employed Plaintiff Jessie Randolph as a security officer for roughly a year, from June 2008 through June 2009. (Randolph Decl., Ex. C to Pl.'s App., ¶ 2.) He too alleges that Sand and Woznicki used racially inflammatory language when speaking about black people "on numerous occasions," although the only incident he specifically recalled involved the aforementioned conversation between Sand and Woznicki where one of them said she was "'gonna fire [Davis's] black ass and teach him a lesson.'" (Randolph Decl. ¶¶ 3, 4.) Metroplex states that Randolph's termination resulted, not from race discrimination, but directly from a June 21, 2009 incident in which Randolph, in an attempt to disperse an angry crowd, fired a warning shot into the air from the .9 mm handgun he had been carrying in violation of Metroplex policy. (Def.'s 56.1 ¶¶ 59, 63.) Randolph admits to having fired his gun, but maintains that it was a blank, not a real bullet. (Randolph Dep., Ex. H to Def.'s App., 60:13-61:11.) Moreover, he contends that Woznicki herself carried a firearm in violation of Metroplex's gun policy from time to time; because he does not substantiate this claim with any evidence, the court disregards it.[5]

---

[5]  The only evidence proffered to support the factual assertion that Woznicki also (continued...)

**IV.     Plaintiff Donald Washington**

Like his co-Plaintiffs, Plaintiff Donald Washington states that while he worked as a security officer at MFGAH, he heard Sand use racially inflammatory language more than once; his declaration does not state, however, that Woznicki also used such language.  (*See* Washington Decl., Ex. D to Pl.'s App.)  Washington was actively employed as an MFGAH security officer from October 2002 until he went on medical leave on February 28, 2008.  (Def.'s 56.1 ¶¶ 68, 69.)  He states that when he was cleared to return to work a little over a year later, he called to be scheduled, but instead, he learned that Metroplex had terminated his employment.  (Washington Decl. ¶¶ 4-7.)  He alleges that race discrimination motivated his termination.

Metroplex contends, however, that after more than a year had passed since Washington left on medical leave, it sent him, and at least ten other inactive employees, a letter requesting clarification of his employment status within ten days.  (Def.'s 56.1 ¶¶ 69-71.)  When another month passed without any response from Washington, nor any indication that the letter was not delivered, Metroplex removed him from the payroll.  (Def.'s 56.1 ¶¶ 72-74.)  Pursuant to the terms of the letter, Metroplex processed Washington's termination as a "quit" and recommended him for rehire in the future.  (Def.'s 56.1 ¶ 75.)  Washington has never sought re-employment with Metroplex.[6]  (Def.'s 56.1 ¶ 76.)

---

[5](...continued)
carried a handgun is Randolph's unsubstantiated statement in his declaration that, while working at MFGAH, he "came to learn" that Woznicki had "carried a firearm while at work."  (Randolph Decl. ¶ 6.)  This statement, without more, is inadmissible hearsay.

[6]     In his declaration, Washington states that he "believe[s]" that a white security officer, Raymond Trunzo, took medical leave and was allowed to return to work. (Washington Decl. ¶ 8.)  Without further evidence substantiating this claim, however, Washington's belief amounts to nothing more than hearsay.  Moreover, it appears that Washington could have resumed work at MFGAH had he simply inquired, and presumably could do so today.

**DISCUSSION**

Defendant Metroplex has moved for partial summary judgment on Count III, which alleges that Plaintiffs were wrongfully terminated in violation of Title VII. The court will grant summary judgment where, construing all facts in the light most favorable to the nonmoving party, *Hanners v. Trent*, ___ F.3d ___, 2012 WL 899062, *6 (7th Cir. Mar. 19, 2012) (citation omitted), there is no genuine issue of material fact and the movant deserves judgment as a matter of law. FED. R. CIV. P. 56(a); *Foster v. State Farm Fire and Cas. Co.*, ___ F.3d ___, 2012 WL 884857, *3 (7th Cir. Mar. 16, 2012) (citation omitted). "[S]ummary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Springer v. Durflinger*, 518 F.3d 479, 484 (quoting *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007)). Bare allegations, unsubstantiated by evidence, are insufficient to establish a genuine factual dispute. *Smith v. Potter*, 445 F.3d 1000, 1006 (7th Cir. 2006).

Title VII prohibits employers from discriminating against employees on the basis of race. 42 U.S.C. § 2000e-2(a)(1). In Count III, Plaintiffs allege that Defendant wrongfully terminated them because of their race and in violation of Title VII. Ordinarily, in order to avert summary judgment on such a claim, a plaintiff must satisfy either the direct or indirect method of proof. Plaintiffs here recognize that they have no evidence that similarly-situated white workers were treated more favorably, and they do not attempt to prove their claims via the indirect method.[7] (Pl.'s Mem. of Law

---

[7] Under the indirect method, Plaintiffs must establish a *prima facie* case of race discrimination under the now familiar *McDonnell Douglas* standard. Specifically, each Plaintiff must show that (I) he is a member of a protected class; (ii) his job performance met the employer's legitimate expectations; (iii) he suffered an adverse employment action; and (iv) a similarly situated individual who was not in the protected class was treated more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Once a plaintiff establishes a *prima facie* case, defendant may proffer a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802 (1973). If the employer does so, the plaintiff bears the burden of showing that the
(continued...)

in Supp. of Their Resp. to Def.'s Mot. for Partial Summ. J., at 3 n.3.) Instead, they rely on the direct method to defeat summary judgment.

Under the direct method of proving race discrimination, Plaintiffs can survive summary judgment if they proffer either direct evidence—"'near-admissions'" of discrimination by the employer—and/or circumstantial evidence that race discrimination motivated Defendant's decision to terminate their employment. *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 809 (7th Cir. 2011) (quoting *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006)). In a race discrimination case, direct evidence can prove intent without requiring an inference whereas circumstantial evidence does require the finder of fact to infer intentional discrimination. *Lewis v. Sch. Dist. 70*, 523 F.3d 730, 742 (7th Cir. 2008). Circumstantial evidence may include a "convincing mosaic" of evidence demonstrating race discrimination. *Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444, 447 (7th Cir. 2012) (citation omitted). Importantly, the focus of direct method analysis is not whether plaintiff proffers direct or circumstantial evidence, but whether the sum of the evidence "'points directly' to a discriminatory reason for an employer's action." *Abuelyaman*, 667 F.3d at 809 (quoting *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008)). Upon a plaintiff's production of such evidence, the defendant's summary judgment motion must fail; there is no burden-shifting. *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 n.3 (7th Cir. 2011.)

For the reasons explained below, three of the four Plaintiffs have failed to satisfy the court that a trier of fact could accept his version of the events pertaining to his termination. Therefore, the court grants Defendant's motion for partial summary judgment on Count III against Plaintiffs Noble, Randolph, and Washington, but not against Plaintiff Davis.

**I.      Denial of Partial Summary Judgment Against Plaintiff Davis on Count III**

Of the four Plaintiffs, only Davis presents a case for racially-motivated termination that is

---

[7](...continued)
employer's stated reason for its action is simply a pretext for discriminatory conduct. *Id.* at 804.

strong enough to survive summary judgment.  Though Defendant's motion for partial summary judgment addresses Plaintiffs' claims under the indirect method of proof, as noted, Davis asserts his wrongful termination claim only under the direct method, and presents both direct and circumstantial evidence.  (Pl.'s Mem. at 3.)

First, Davis asserts that direct evidence of race discrimination is before the court in the form of Randolph's statement that he overheard a conversation in which either Sand or Woznicki said, in reference to Davis, "[I'm] gonna fire his black ass to teach him a lesson."  (Randolph Decl., Ex. C to Pl.'s App., ¶ 4.)  What makes that statement particularly inculpating, argues Davis, is the reference to an adverse employment action (termination) and to Davis's race ("black ass") in the same sentence.  (Pl.'s Mem. at 5.)  Second, Davis notes additional, circumstantial evidence of Sand's and Woznicki's discriminatory intent:  their frequent use of racially derogatory terms at MFGAH and the noticeable increase in disciplinary action against Davis when Woznicki, who is white, replaced Davis's prior supervisor, who was black.  (Pl.'s Mem. at 11.)  Davis argues this evidence, viewed collectively, constitutes the "convincing mosaic" necessary to show that Davis's termination resulted from Defendant's racial animus.  Defendant, on the other hand, states that Davis was discharged for his violation of the MFGAH policy that requires security officers to deny entry to visitors on the "barred" guests list—a violation that, according to Metroplex, presented a serious security threat and exposed the management company to significant liability.  (Def.'s Mem. at 5-6.)

Defendant has identified a compelling reason for Davis's termination.  The court nevertheless concludes that a jury might reasonably find that the termination was motivated, at least in part, by Woznicki's and/or Sand's discriminatory intent, given the racially inflammatory comments Davis identifies.  *See, e.g.*, *Hossack v. Floor Covering Assoc. of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007) (describing a "mixed motive" case of Title VII discrimination as "one in which both legitimate and illegitimate reasons motivate an employment decision"); *Compare*

10

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, ___, 129 S. Ct. 2343, 2349 (2009) (holding that, unlike cases arising under Title VII, an age discrimination claim requires a showing that age was the but-for reason for the employer's decision and not simply a motivating favor). Generally, "isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Merillat v. Metal Spinner, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006) (quoting *Cullen v. Olin Corp.*, 195 F.3d 312, 323 (7th Cir. 1999)). But where the individual who made the remarks "provided input into the employment decision—and the remarks were made around the time of and in reference to that decision—'it may be possible to infer that the decision makers were influenced by those [discriminatory] feelings.'" *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (alteration in original) (quoting *Hunt v. City of Markham*, 219 F.3d 649, 652-53 (7th Cir. 2000)); *see also Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 829 (7th Cir. 2008) ("Derogatory remarks based on an employee's race can be direct evidence of discrimination if they are made by the decisionmaker (or by a person who influences the decisionmaker), near the time of the decision to fire the employee, and in relation to the employee's discharge.")

Defendant argues that Sand and Woznicki had no "input" into the decision to terminate Davis (Def.'s Reply Mem. in Supp. of Mot. for Partial Summ. J., at 7-8), but the court is unconvinced. Woznicki investigated Davis's violation of the "barred" guest policy, gathered written statements from witnesses, and reported the incident to Sand, Nelson, and Kennedy. (Def.'s 56.1 ¶¶ 33, 34.) Defendant states that Woznicki did this "[i]n keeping with Metroplex policy" (Def.'s 56.1 ¶ 34), but does not explain which Metroplex policy requires Woznicki to investigate, document, and report officers' policy infractions clear up the ladder to Kennedy; with a staff of roughly 60 officers in one of many buildings managed by Metroplex, it is not clear to the court that every violation of employment policy that occurs at MFGAH will be reported to the Vice-President of Operations. Davis's infraction was undoubtedly serious, but that does not alter the fact that

Woznicki had some discretion in investigating and reporting the infraction. Nor is there any evidence that Kennedy, in deciding to fire Davis, relied on anything other than the information furnished by Woznicki. Moreover, Metroplex's own statements in its response to Davis's EEOC charge belie the notion that Woznicki and Sand were completely removed from the decision to terminate Davis. In the response letter Kennedy sent to the EEOC, he lists both Woznicki and Sand, in addition to Nelson and himself, as parties "involved in the decision or recommendation to discharge [Davis]." (Jan. 22, 2009 Letter to EEOC at 7.) Woznicki and Sand contributed at least some "input" into Kennedy's decision to terminate Davis, and a jury could reasonably infer that Nelson and Kennedy were influenced by Woznicki's and Sand's discriminatory feelings.

Metroplex argues, further, that there is no temporal connection between the alleged discriminatory remarks and Davis's termination. Admittedly, Randolph's declaration does not state *when* he overheard the Sand-Woznicki conversation in which one of them expressed the intent to fire Davis's "black ass," but that omission does not render the statement irrelevant. As Davis observes, at the most, the conversation took place four months before his termination, since Randolph was hired on June 23, 2008, and Davis was terminated on October 20, 2008. (Randolph Decl. ¶ 2; Def.'s 56.1 ¶ 43.) The Seventh Circuit has noted that "three to four months between a remark and an employment action is not so long as to defeat the inference of a causal nexus." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 632 (7th Cir. 2009) (citation omitted). That inference is even stronger where, as here, the remark directly links Davis's protected status to the adverse employment action.

In a line of reasoning similar to, but distinguishable from, Defendant's position that Woznicki and Sand had no "input" into Davis's termination, Defendant asserts that Davis cannot show Woznicki or Sand proximately caused his discharge, and that Davis's reliance on recent Supreme Court case law regarding *respondeat superior* liability in employment discrimination suits is misplaced. Defendant emphasizes that Nelson and Kennedy were ultimately responsible for

12

terminating Davis, not Sand or Woznicki, so unless Davis can show discriminatory intent on the part of Nelson and/or Kennedy (which he cannot), Defendant must win summary judgment on his claim. (Def.'s Reply Mem. at 6-7.)

As Plaintiffs observe, the Supreme Court has recently held that an employer may be held liable for the discriminatory conduct of a supervisor even where the supervisor was not directly responsible for the adverse employment action the plaintiff suffered. *Staub v. Proctor Hosp.*, ___ U.S. ___, 131 S. Ct. 1186, 1194 (Mar. 1, 2011). In that case, Staub's supervisors, motivated by dislike of his army reservist status, fabricated an allegation that Staub violated hospital policy, thereby causing a human resources official to terminate Staub's employment. *Id.* at 1189. The Court found that the defendant hospital could be held liable for the conduct of Staub's supervisors because the supervisors (I) acted within the scope of their employment; (ii) were motivated by discriminatory animus; and (iii) had the specific intent to cause his termination. *Id.* at 1194.

There is no evidence here that either Sand or Woznicki fabricated any information related to Davis's violation of the "barred" guest policy (indeed, he admits he violated the policy), but Davis notes that Woznicki investigated and reported Davis's "barred" guest policy violation and that, as evidenced by Kennesy's letter to the EEOC, both Woznicki and Sand may have recommended Davis's termination. (*See, e.g.*, Jan. 22, 2009 Letter to EEOC at 6) ("For these reasons, Woznicki, Sand, and Nelson made the decision to terminate [Davis's] employment."). The improper supervisor conduct Davis identifies may not be as overtly devious as that in *Staub*, but a jury could reasonably find that a recommendation for Davis's termination by Sand and/or Woznicki proximately caused Nelson, and subsequently Kennedy, to order the termination.[8] A jury may also conclude that the statement by Sand or Woznicki that she wanted to "fire [Davis's] black ass," when

---

[8] Though Staub's claim arose under the Uniformed Services Employment and Reemployment Act (USERRA) and not Title VII, the Court noted that USERRA is very similar to Title VII in that a claim under either statute must show that the improper discrimination was a motivating factor in the employer's action.

13

considered in light of the other racially inflammatory language Davis alleges, demonstrates both racial animus and an intent to cause Davis's termination, thereby suggesting that racial discrimination could have been afoot in the decision to terminate Davis. Defendant's proffer of a legitimate, non-discriminatory reason for terminating Davis is inapposite; the evidence is sufficient (if barely so) under the direct method to compel denial of Defendant's motion for summary judgment on his wrongful termination claim.

## II.      Grant of Summary Judgment Against Plaintiffs Noble, Randolph, and Washington

Davis, however, is the only one of Plaintiffs that can establish a genuine issue of material fact as to his wrongful termination claim. As explained below, neither Noble, Randolph, nor Washington has demonstrated, under the direct method, that racial discrimination played a role in his termination.

### A.      Plaintiff Noble

In addition to his general exposure to Sand's and Woznicki's use of racial epithets, Noble alleges that, sometime between May 2006 and October 2008,[9] Sand told him, "[Y]our black ass is too friendly with these fucking niggers, you must not want your job." (Noble Decl. ¶ 6.) But this "stray remark" only loosely refers to Noble's employment at MFGAH and may have occurred more than two years before his termination; it does not "point directly" to racial animus as the basis for his termination.

Noble asserts, further, that when he was terminated, he refused to sign his termination agreement, prompting Sand to call him a "fucking nigger," and Woznicki to tell him to "get [his] black ass out of [there]." (Noble Decl. ¶ 6, 9.) He argues that the use of racial epithets "contemporaneous[ly]" with his termination is direct evidence of discriminatory motives for that

---

[9] The court is puzzled by the time frame in which Noble alleges hearing Sand use racially inflammatory language; though he says the offensive language continued through October 2008, Noble was terminated in August 2008.

14

termination. (Pl.'s Mem. at 6.) While such abhorrent language has no place in a work environment, it does not prove racial animus motivated the adverse employment action; Noble alleges Sand and Woznicki uttered the racial epithets *after* they informed him of his termination and thus, the decision to terminate had already been made. *Cf. Overly v. KeyBank Nat'l Assoc.*, 662 F.3d 856, 864 (7th Cir. 2011) (supervisor's conduct in calling plaintiff a "bitch" after she resigned does not demonstrate a hostile work environment during her employment).

Moreover, Defendant states that it terminated Noble's employment because he granted a young man access to the apartment of a female tenant without her consent; the tenant was very upset when she came home late at night to find the unwanted visitor. (Def.'s Mem. at 13.) Noble does not dispute that he committed this policy violation. In light of the facts alleged, Noble has failed to produce a "convincing mosaic" of evidence showing that his termination was a product of Defendant's discriminatory intent. The court grants summary judgment for Defendant on his claim.

B.     **Plaintiff Randolph**

Plaintiff Randolph, too, fails to raise a genuine issue of material fact regarding his termination. While he reports hearing "Sand and/or Woznicki use racially inflammatory language regarding black people on numerous occasions" (Randolph Decl. ¶3), he does not proffer any specific comments or conduct that link racial animus to his termination. Such "stray remarks," temporally and substantively disconnected from Randolph's termination, "are insufficient to establish that a particular decision was motivated by discriminatory animus." *Merillat*, 470 F.3d at 694. Nor does Randolph avert summary judgment because he heard Sand or Woznicki threaten to "fire [Davis's] black ass," as that remark is also unrelated to Randolph's own termination. Without more, no reasonable jury could find that Defendant terminated Randolph because of his race. The weakness of Randolph's case becomes even more evident when viewed in light of Defendant's stated reason for his termination: he carried, and fired a warning shot from, a .9 mm handgun while on the MFGAH premises and in violation of MFGAH policy. (Def.'s Mem. at 15.)

The court grants Defendant's motion for summary judgment against Randolph on his wrongful termination claim, as well.

### C. Plaintiff Washington

Plaintiff Washington presents the weakest case of all. He alleges race discrimination based on nothing more than (1) Sand's use of "racially inflammatory language regarding black people on numerous occasions" and (2) his termination after spending more than a year on medical leave. (Washington Decl. ¶¶ 3, 6, 7.) As noted, "stray remarks" (particularly the highly generalized ones that Washington alleges) that are neither temporally nor substantively linked to Washington's termination do not prove discriminatory intent. Washington offers no other evidence of race discrimination.

Defendant, however, offers an obviously race-neutral explanation for Washington's termination: in March 2009, after Washington had been on medical leave for more than a year, Metroplex sent him a letter asking him to respond within ten days if he intended to maintain his employment at MFGAH, and there was no response. (Def.'s 56.1 ¶¶ 69-72.) Defendant waited a full month before it removed Washington from its payroll. (Def.'s 56.1 ¶ 74.) Moreover, Washington's termination was recorded as a "quit" and he was deemed eligible for re-hire, yet Washington has never attempted to return to MFGAH. (Def.'s ¶¶ 75, 76.) No reasonable jury could find that race discrimination motivated Washington's termination—particularly since it appears that he is still eligible for re-hire—and thus, his wrongful termination claim does not survive summary judgment.

**CONCLUSION**

For the reasons explained herein, the court grants Defendant's Motion for Partial Summary Judgment [23] against Plaintiffs Noble, Randolph, and Washington, but denies the motion as against Plaintiff Davis.

ENTER:

Dated: March 28, 2012

REBECCA R. PALLMEYER
United States District Judge